## UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| FLORENCE CAESAR, | : | CIVIL NO: 1:10-CV-00202 |
| | : | |
| Plaintiff, | : | |
| | : | (Judge Conner) |
| v. | : | |
| | : | (Magistrate Judge Schwab) |
| PENNSYLVANIA DEPARTMENT | : | |
| OF CORRECTIONS, *et al.*, | : | |
| | : | |
| Defendants. | : | |

## REPORT AND RECOMMENDATION

### I. **Introduction**.

The Plaintiff, Florence Caesar ("Caesar"), a state prisoner, commenced this action on January 26, 2010, pursuant to 42 U.S.C. § 1983 and contends that the Defendant, Brian Shiptoski ("Shiptoski"), violated her Eighth Amendment rights provided in the United States Constitution. Before the Court is Shiptoski's motion for summary judgment. Having found that the undisputed material facts establish that Shiptoski's acts did not give rise to a constitutional violation under the Eighth Amendment, we recommend that Shiptoski's motion for summary judgment be granted.

### II. **Background and Procedural History**.

Caesar ("Caesar"), proceeding *pro se*, commenced this action by filing a complaint on January 26, 2010, against the following 11 defendants: (1) Jeffrey

Beard, the Secretary of the Pennsylvania Department of Corrections ("DOC");(2)

Shirley Moore-Smeal, a former Superintendent at the State Correctional Institution

at Muncy ("SCI-Muncy"); (3) Dawn Chamberlin, a former Superintendent at SCI-

Muncy; (4) Mariosa Lamas, the current Superintendent at SCI-Muncy; (5) Troy

Edwards, the Superintendent's Assistant and Grievance Coordinator; (6) DOC; (7)

Shoptoski, a Certified Registered Nurse Practitioner ( "CRNP") at SCI-Muncy; (8)

Andrew Peters, a Psychiatrist at SCI-Muncy; (9) Susan Seybert ("Seybert"), the

Mental Health Director at SCI-Muncy; (10) Jill Shepler, current Deputy

Superintendent for Centralized Services at SCI-Muncy; and (11) Officer Garrison,

a corrections officer at SCI-Muncy. *Doc*. 1 at 4-5. Defendants Beard, Moore-

Smeal, and Shepler were sued in their individual capacity. *Id.* The remaining

defendants were sued in their individual and official capacities. *Id.* Further,

Caesar's claims involved a myriad of constitutional violations arising out of her

confinement in a psychiatric observation cell ("POC"). *See Doc.* 1. On May 17,

2010, Caesar filed a motion to proceed *in forma pauperis* (*Doc.* 13) that was

granted by the Court. *Doc.* 17.

Subsequently, by an order dated May 21, 2010, the Court permitted Caesar

to file an amended complaint. *Doc.* 17. On October 20, 2010, Caesar filed a

timely amended complaint raising the same legal claims and factual allegations as

in her initial complaint.  *See Doc.* 30.  Caesar did, however, add Howard Woodring ("Woodring"), a psychologist at SCI-Muncy, as a defendant.  *Id.*

After screening the amended complaint pursuant to 28 U.S.C. § 1915A, Magistrate Judge Smyser[1] issued a report and recommendation, wherein he recommended that the action be dismissed, except as to the Eighth Amendment claims against Shiptoski for allegedly acting with "deliberate indifference" to Caesar's serious medical needs by overmedicating her, and by placing her in a POC with a defective smock, without any hygiene or legal materials, without authority to admit her, and for the purpose of having her legal documents stolen. *Doc.* 32 at 32-33.  On January 6, 2011, the Court adopted Judge Smyer's report and recommendation in its entirety.  *Doc.* 42.

Caesar's Eighth Amendment claims against Shiptoski stem from her detention in a POC, from about April 29 - May 14, 2007.[2]  Caesar alleges that on the night of April 29, 2007, she was taken to the infirmary because corrections officers thought something was wrong with her.  At the infirmary, the corrections officers talked with the nurses.  After talking with the nurses, the corrections officers informed Caesar that Shiptoski, a CRNP, wanted her committed to the POC.  Shiptoski told Caesar that she was being committed to a POC for

_____

[1] Judge Smyser has since retired, prompting the Court to remand this case to the undersigned.

[2] The facts recited herein are taken from Caesar's amended complaint, *Doc.* 30.

observation. While in the POC, Caesar alleges that Shiptoski overmedicated her and that the medication caused her to feel faint, confused, and "considerably worse." Caesar also claims that Shiptoski admitted her to a POC in order for prison officials to steal her legal materials.

On May 2, 2007, Caesar claims that she was discharged from a POC. While returning to her regular prison unit, Caesar alleges that she started to feel weak, confused, and dizzy. According to her, upon returning to her cell, Caesar immediately noticed that her medication, grievance papers, and a pair of sneakers were missing. Caesar claims that she informed a corrections officer about the missing items. Later that day, however, Caesar was allegedly readmitted to a POC.

On May 6, 2007, Caesar alleges that she was overmedicated again, causing her to become dizzy. Further, she claims that she was given a smock that was defective in that it was missing a velcro fastener. Thus, Caesar alleges, every time she was called to the door of her POC, her smock would fall off exposing her nude body to the prison staff. On this particular day, Caesar also claims that she tripped over the bed because of the defective smock and the medication. When she fell, she allegedly cut her leg. At one point during her commitment in the POC, Caesar also purportedly asked for a new smock, but someone told her there was none. As well, according to Caesar, every time she took the medication her smock fell off, allowing the all-male staff, in her POC, to see her naked.

On May 10, 2007, Caesar allegedly started to feel better despite not taking her medication. Nonetheless, Caesar claims that Shiptoski told her that she would not be released from her POC until she resumed taking the medication. When Caesar asked Shiptoski why he admitted her to a POC, Shiptoski purportedly told Caesar that she was becoming aggressive. Finally, seven days later, on May 17, 2007, Caesar was released from her POC and returned to her regular prison unit assignment. When she returned to her cell, Caesar again reported that her medication, grievance papers, and a pair of sneakers were missing. Caesar maintains that she was admitted to a POC so that her grievance papers could be stolen from her. Moreover, while she was admitted to a POC, Caesar contends that she was denied access to her legal and hygiene materials.

On May 28, 2007, Caesar asserts that she asked to review her medical records. Upon reviewing her medical records, Caesar claims that she found a few inconsistencies. In particular, Shiptoski purportedly lied by writing on Caesar's paperwork that Dr. Calvert approved his actions. Also, according to Caesar, Dr. Calvert allegedly told her that he never admitted her to the POC or prescribed her the medication that she received while committed there. Additionally, Caesar claims that an official memo given to her misrepresented that Shiptoski was a doctor, when he is actually a CRNP. Thus, Caesar believes, Shiptoski had no authority to admit her to a POC or to prescribe her medication.

As mentioned, pending before the Court is Shiptoski's motion for summary judgment that was filed on March 27, 2012, along with a brief, a statement of material facts, and documents in support of his motion.[1]  *Docs.* 98 & 99.  On April 16, 2012, Caesar moved for a six month extension of time to respond.  *Doc.* 103. Subsequently, on April 23, 2012, the Court granted Caesar's motion and gave her until October 16, 2012, to file a proper response.  *Doc.* 105.  Also, given the evidence of Caesar's psychiatric history provided by Shiptoski, the Court reconsidered Caesar's previous motion for appointment of counsel.  *Id.*  Thus, the Court requested the *pro bono* chair of the Middle District Chapter of the Federal Bar Association to help find an attorney to represent Caesar.  *Id.*

Thereafter, on August 6, 2012, the *pro bono* chair informed the Court that an attorney was willing to look into Caesar's case.  *Doc.* 111.  However, a significant delay ensued during which the Court did not hear from the *pro bono* chair on the status of his efforts to find counsel for Caesar.  *Docs.* 115, 116, & 117.  On March 1, 2013, the *pro bono* chair informed the Court by letter that despite his efforts, he was unable to secure counsel for Caesar, prompting the Court to issue an order

---

[1]    On March 13, 2012, Shiptoski filed a prior motion for summary judgment. *Doc.* 95.  But, because Shiptoski did not file a brief in support of the motion, it was withdrawn by the Court.  *Doc.* 94.  The withdrawal of Shiptoski's prior motion for summary judgment has no effect on the motion for summary judgment that the Court is now addressing.

granting Caesar an additional 30 days to file a response to Shiptoski's motion for summary judgment. *Docs.* 120 & 121.

After the additional 30 days expired, the Court received a second motion from Caesar, requesting an extension of time to respond to Shiptoski's motion for summary judgment. *Doc.* 124. In her motion, Caesar claimed that she had been involuntarily committed to a mental health unit, and, since September 27, 2012, she had no access to her legal materials in order to work on her case. *See generally id*. Also, Caesar asserted that since that date, she has not received her mail. *Id.* Furthermore, Caesar claimed that she would be involuntarily committed in a mental health unit, until June 15, 2013. *Id.* In light of her motion, coupled with her extensive psychiatric history and *pro se* status, the Court required Shiptoski to respond to her motion for a second extension of time. *Doc.* 125.

On June 13, 2013, Shiptoski filed his response along with a declaration from the Superintendent's Assistant at SCI-Muncy. *Docs.* 134 & 134-1. Having reviewed both documents and determined that Caesar was not deprived access to her legal materials wherein she was unable to provide any response to the motion for summary judgment, we denied Caesar's motion for an extension of time. *See Doc.* 135.

For the reasons that follow, we recommend that Shiptoski's motion for summary judgment be granted.

## III.  Discussion.

### A. Summary Judgment Standard.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).  The moving party bears the initial responsibility of informing the court of the basis for its motion and identifying those portions of the record which demonstrate the absence of a genuine dispute of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  With respect to an issue on which the nonmoving party bears the burden of proof, the moving party may discharge that burden by "'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.  Once the moving party has met its burden, the nonmoving party may not rest upon the mere allegations or denials of its pleading; rather, the nonmoving party must show a genuine dispute by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials" or "showing that the materials cited do not establish the absence ... of a genuine dispute." Fed.R.Civ.P. 56(c).

Summary judgment is not appropriate when there is a genuine dispute about a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A fact is material if it will affect the outcome of the trial under governing law. *Id.* A dispute as to a material fact is "'genuine' only if a reasonable jury, considering the evidence presented, could find for the non-moving party." *Childers v. Joseph*, 842 F.2d 689, 693–94 (3d Cir. 1988). "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "If the evidence is merely colorable ... or is not significantly probative ... summary judgment may be granted." *Anderson*, *supra*, 477 U.S. at 249–50. In determining whether a genuine issue of material fact exists, the court must consider all evidence in the light most favorable to the nonmoving party. *White v. Westinghouse Elec. Co.*, 862 F.2d 56, 59 (3d Cir. 1988).

At the summary judgment stage, the judge's function is not to weigh the evidence or to determine the truth of the matter, but it is to determine whether there is a genuine issue for trial. *Anderson*, *supra*, 477 U.S. at 249. The proper inquiry "is the threshold inquiry of determining whether there is the need for a trial— whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250.

Summary judgment is warranted, after adequate time for discovery, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. *Celotex*, *supra*, 477 U.S. at 322. "Under such circumstances, 'there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.'" *Anderson v. CONRAIL*, 297 F.3d 242, 247 (3d Cir. 2002) (quoting *Celotex*, *supra*, 477 U.S. at 323).

**B. <u>Material Facts</u>**.

Local Rule 56.1, provides:

A motion for summary judgment filed pursuant to Fed.R.Civ.P. 56, shall be accompanied by a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.

Statements of material facts in support of, or in opposition to, a motion shall include references to the parts of the record that support the statements.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party.

A party who seeks to resist a summary judgment motion must also comply with

Local Rule 56.1, which specifically directs a party opposing a motion for summary

judgment to submit a "statement of the material facts, responding to the numbered

paragraphs set forth in the statement required [to be filed by the movant], as to

which it is contended that there exists a genuine issue to be tried"; if the

nonmovant fails to do so, "[a]ll material facts set forth in the statement required to

be served by the moving party will be deemed to be admitted."  M.D.Pa.L.R. 56.1.

Under the Local Rules, the failure to follow these instructions and appropriately

challenge the material facts tendered by the defendant means that those facts must

be deemed admitted, since:

> A failure to file a counter-statement equates to an admission of all
> the facts set forth in the movant's statement.  This Local Rule serves
> several purposes.  First, it is designed to aid the Court in its
> determination of whether any genuine issue of material fact is in
> dispute.  Second, it affixes the burden imposed by Federal Rule of
> Civil Procedure 56(e), as recognized in *Celotex Corp. v. Catrett*, on
> the nonmoving party 'to go beyond the pleadings and by her own
> affidavits, or by the depositions, answers to interrogatories, and
> admissions on file, designated specific facts showing that there is a
> genuine issue for trial.' 477 U.S. 317, 324, 106 S.Ct. 2548, 91
> L.Ed.2d 265 (1986) (internal quotations omitted) (emphasis added).

*Doe v. Winter*, No. 04–CV–2170, 2007 U.S. Dist. LEXIS 25517, *2 n. 2 (M.D.Pa.

Apr. 5, 2007) (parallel citations omitted; court's emphasis).

A party cannot evade these litigation responsibilities in this regard simply by

citing the fact that she is a *pro se* litigant.  These rules apply with equal force to all

parties. *See Sanders v. Beard*, No. 09–CV–1384, 2010 U.S. Dist. LEXIS, *15 (M.D.Pa. July 20, 2010) (*pro se* parties "are not excused from complying with court orders and the local rules of court"); *Thomas v. Norris*, No. 02–CV–01854, 2006 U.S. Dist. LEXIS 64347, *11 (M.D.Pa. Sept. 8, 2006) (*pro se* parties must follow the Federal Rules of Civil Procedure).

Here, Caesar did not file any response, much less a "separate, short and concise statement of the material facts, responding to the numbered paragraphs" set forth in Shiptoski's statement of material facts as required by Local Rule 56.1. Thus, in accordance with this Local Rule, all material facts set forth in Shiptoski's statement of material facts are deemed to be admitted. We set forth the material facts as follows.

Caesar is a 70 year old woman, who is incarcerated at SCI-Muncy, which is also the location of all events relevant to the case. *Doc.* 99-1 at ¶ 1. She is serving a sentence for second-degree murder. *Id.* Caesar has been diagnosed with schizophrenia, or schizioaffective disorder, bipolar type. *Id.*

Shiptoski has been a registered nurse ("RN") since 1978. *Doc.* 99 at ¶ 1. After becoming an RN, Shiptoski obtained further training and became a CRNP in 2002. *Id.* In 2005, Shiptoski began working at SCI-Muncy as a mental health provider, and a member of the Psychiatric Review Team. *Id.* at ¶ 2. He has experience treating patients with schizophrenia and related conditions. *Id.* at ¶ 3.

As a CRNP working for the DOC, at SCI-Muncy, Shiptoski had the authority to admit a patient to a POC, in order to monitor him or her for reasons such as becoming a threat of harm to themselves or others, psychological decompensation, or other behaviors. *Id.* at ¶ 5. Additionally, Shiptoski had the authority to examine and treat patients while they are admitted to a POC, including ordering prescription medications, and releasing patients from a POC. *Id.*

In October 2005, Caesar was seen by Seybert, who is the director of the Mental Health Unit ("MHU") at SCI-Muncy. *Doc.* 99-1 at ¶ 6. Seybert's assessment of Caesar was stable schizophrenia. *Id.* Seybert wrote an order for Caesar to continue Risperdal 1 mg, which was approved by psychiatrist, Dr. Keith Tolan ("Tolan") on the same day. *Id.*

On January 20, 2006, for reasons unknown to the Court, Caesar was seen by Shiptoski. *Id.* at ¶ 8. Caesar informed Shiptoski that she was "fine." *Id.* Caesar also appeared to be awake, alert, and oriented. *Id.* As well, Caesar denied suicidal or homicidal thoughts. *Id.* Shiptoski's assessment was stabilized schizophrenia. *Id.* Shiptoski prescribed Risperdal and ordered that Caesar be seen again in two months. *Id.*

On March 20, 2006, Shiptoski saw Caesar again, for a follow up visit. *Id.* at ¶¶ 8, 11. Caesar told Shiptoski that she was "fine," and she requested to decrease her medication (i.e. Risperdal) because she believed that she might not be

schizophrenic.  *Id.*  Nonetheless, Caesar was alert and oriented.  *Id.*  Shiptoski's assessment was schizophrenia, paranoid - stabilized.  *Id.*  Shiptoski continued Caesar's medication, and he reviewed the plan with Dr. Tolan, who ended up entering an order for Risperdal 1 mg.  *Id.* at ¶¶ 11-12.

On April 21, 2006, Caesar was seen by Dr. Tolan.  *Id.* at ¶ 13.  Caesar expressed concern that she was not schizophrenic and did not need Risperdal.  *Id.*  Dr. Tolan's assessment, however, was schizophrenia and he planned to see her again in two to three months.  *Id.*  Moreover, he continued Caesar's Risperdal prescription because he believed that she needed it to remain stable.  *Id.*

Over the next several months, Caesar met with Woodring and Dr. Tolan, for routine monitoring.  *See generally, Id.* at ¶¶ 14-21.  On August 22, 2006, Dr. Tolan ordered a reduction in the dosage of her Risperdal from 1 mg per day to .5 mg.  *Id.* at ¶ 16.  Dr. Tolan reduced the Risperdal dosage because Caesar voiced concerns about tardive dyskinesia ("TD"), a disorder characterized by abnormal involuntary movements caused by long term or high dose usage of antipsychotic drugs.  *See id.*

On January 10, 2007, Caesar was seen again by Shiptoski.  *Id.* at ¶ 22.  Caesar told Shiptoski that she was not schizophrenic.  *Id.*  Caesar denied suicidal or homicidal thinking or hallucinations, and she was not overtly psychotic.  *Id.*  Also, Caesar requested to lower her Risperdal dosage.  *Id.*  Shiptoski complied

with Caesar's request and reduced the Risperdal dosage from .5 mg to .25 mg. *Id.* Shiptoski's assessment was schizophrenia – TD. *Id.*

On March 24, 2007, by way of written response to Caesar's inmate request, Dr. Jacinta Wood ("Wood") increased Caesar's Risperdal prescription from .25 mg to 1 mg.[3] *Id.* at ¶ 24. Subsequently, on April 3, 2007, Wood formally met with Caesar. *Id.* at ¶ 25. Wood was familiar with Caesar from previous treatment, during the 1998 to 2003 time period. *Id.* On this particular day, Caesar was alert, oriented, and did not exhibit any signs of paranoid hallucinations. *Id.* Wood's assessment was history of schizophrenia. *Id.* Wood also continued the Risperdal, but noted that the dosage would probably be decreased. *Id.*

A month later, on April 25, 2007, Caesar sent Wood a request. *Id.* at ¶ 26. Caesar reported an increase in her "stressors," and that she struggled with feelings of paranoia. *Id.* Consequently, Wood increased the Risperdal dosage from .5 mg to 1 mg. *See id.* Four days later, Caesar was sent to a POC. *Id.* at ¶ 27.

On April 29, 2007, corrections officers reported that Caesar was giving away personal items, talking about God, and talking to herself a lot. *Id.* Caesar, though, talked to one of the nurses at SCI-Muncy and denied intending to harm herself or others. *Id.* Nevertheless, after talking to Caesar, the nurse called Shiptoski, who ordered that Caesar be admitted to a POC because of threats of a suicidal or

---

[3] The record does not appear to explain why Wood increased Caesar's Risperdal dosage.

homicidal nature. *Id.* at ¶ 27-28. While in a POC, Caesar remained under constant monitoring, and she was limited to a suicide blanket, anti-suicide smock, and mattress. *Id.* at ¶¶ 28-29; *see also Doc.* 99 at ¶ 18. At no time was Shiptoski aware that Caesar's smock did not fit her or that she had problems closing it. *Doc.* 99 at ¶ 22.

On April 30, 2007, Shiptoski met with Caesar in her POC. *Doc.* 99-1 at ¶ 30. Caesar would not answer any questions about suicidal thoughts or delusions. *Id.* Shiptoski's assessment was schizophrenia, and he ordered an increased dosage of Risperdal to 1.5 mg. *Id.* Shiptoski also felt that Caesar's refusal to communicate was an extension of paranoid thinking. *Id.* In the two days that followed, Shiptoski met with Caesar again. *Id.* at ¶¶ 31-32. On May 2, 2007, Caesar's condition improved, and Shiptoski ordered her discharge from her POC. *Id.* at ¶ 32.

On the day that Caesar was discharged from her POC, it was reported that she appeared confused, delusional, and displayed an alerted mental status. *Id.* at ¶ 33. Shiptoski also noted that Caesar refused her medications, and made threats of harm to herself and others. *Id.* Consequently, Caesar was readmitted to a POC on the same day she was originally discharged. *See id.* at ¶¶ 33-35. On readmission, Caesar was again limited to a suicide blanket, smock, and mattress. *Id.* at ¶ 34. As

well, Shiptoski ordered a prescription for Caesar of Thorazine 50 mg, Risperdal 1.5 mg, hydrochlorothiazide 25 mg, Atenolol 100 mg, asprin, and Vitamin E. *Id.*

Caesar was readmitted to a POC for 15 days. *Id.* at ¶ 15. On May 3, 2007, Shiptoski saw Caesar, and his assessment was schizophrenia and depression. *Id.* He continued her Risperdal and ordered Prozac 20 mg to treat the depression. *Id.* Caesar, though, refused to take any of the medication that day. *Id.* The following day, May 4, 2007, Shiptoski saw Caesar again. *Id.* at ¶ 37. Despite denying that she had any suicidal or disorganized thoughts, Caesar's affect, according to Shiptoski, was both guarded and suspicious. *Id.* Shiptoski subsequently increased her Risperdal prescription to 2 mg. *Id.* That morning Caesar took the medication, but she later refused it at lunch. *Id.* Then, on May 6, 2007, the prison staff noted that Caesar was doing jumping jacks inside of her cell without wearing the anti-suicide smock. *Id.* at ¶ 39.

Again, on May 7, 2013, Shiptoski met with Caesar in her POC. *Id.* at ¶ 40. Caesar told Shiptoski that she did not need medication. *Id.* As well, Caesar seemed depressed and slightly hostile. *Id.* Thus, Shiptoski's plan was to continue the POC stay and the medication. *Id.* Over the next two days, Shiptoski attempted to talk to Caesar. *Id.* at ¶ 41, 43. Caesar, however, refused to talk to him, and she continued to refuse the medication because she thought it was unnecessary and would kill her. *Id.* at ¶ 41-43.

On May 10, 2007, Caesar was seen by Seybert again. *Id.* at ¶ 45. Caesar told Seybert that she was not going to take 2.5 mg of Risperdal, and she denied having any mental illness. *See id.* Seybert's assessment was non-compliance with prescribed treatment. *Id.* Seybert also noted that Caesar's judgment was poor, and Caesar's insight into her illness was "nil." *Id.* The next day, Caesar met with Wood, who noted that Caesar continued to refuse the medication and was paranoid. *Id.* at ¶ 46. Thus, Wood ordered a continuation of the 2 mg of Risperdal. *Id.*

From May 14 –15, 2007, Caesar still refused to take her medication. *Id.* at ¶ 48. On May 16, 2007, though, Caesar finally agreed to take .25 mg of Risperdal. *Id.* at ¶ 49. Subsequently, Shiptoski ordered that Caesar could be discharged the next day. *Id.*

On the following day, May 17, 2007, Shiptoski met with Caesar in her POC. *Id.* at ¶ 50. Caesar had a normal affect and a neutral mood. *Id.* After she took her Risperdal that day, Caesar was discharged from her POC. *See id.* Based on the record, it does not appear that Shiptoski met with or assessed Caesar again.

## C. Legal Standards Governing Eighth Amendment "Deliberate Indifference" Claims.

The gravamen of Caesar's amended complaint is that Shiptoski violated her rights under the Eighth Amendment to the United States Constitution by displaying "deliberate indifference" to her medical needs. Caesar also claims that her Eighth

Amendment rights were violated in that Shiptoski acted with "deliberate indifference" by admitting her to a POC without hygiene or legal materials, for the purpose of having her legal documents stolen from her, and with a defective smock that caused her to be naked and cut her leg.

To sustain these claims, Caesar must plead facts which:

> [M]eet two requirements: (1) "the deprivation alleged must be, objectively, sufficiently serious;" and (2) the "prison official must have a sufficiently culpable state of mind." *Farmer v. Brennan*, 511 U.S. 825, 834, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) (quotation marks and citations omitted). In prison conditions cases, "that state of mind is one of 'deliberate indifference' to inmate health or safety." *Id.* "Deliberate indifference" is a subjective standard under *Farmer* - the prison official-defendant must actually have known or been aware of the excessive risk to inmate safety.

*Beers–Capitol v. Whetzel*, 256 F.3d 120, 125 (3d Cir. 2001).

In the medical context, a constitutional violation under the Eighth Amendment occurs only when state officials are deliberately indifferent to an inmate's serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 105 (1976). To establish a violation of her constitutional right to adequate medical care in accordance with this standard, an inmate is required to point to evidence that demonstrates (1) a serious medical need, and (2) acts or omissions by prison officials that indicate deliberate indifference to that need. *Rouse v. Plantier*, 182 F.3d 192, 197 (3d Cir. 1999).

Deliberate indifference to a serious medical need involves the "unnecessary and wanton infliction of pain." *Estelle*, 429 U.S. at 104. Such indifference may be evidenced by an intentional refusal to provide care, delayed provision of medical treatment for non-medical reasons, denial of prescribed medical treatment, denial of reasonable requests for treatment that results in suffering or risk of injury, *Durmer v. O'Carroll*, 991 F.2d 64, 68 (3d Cir. 1993), or "persistent conduct in the face of resultant pain and risk of permanent injury," *White v. Napoleon*, 897 F.2d 103, 109 (3d Cir. 1990).

However, it is also clear that the mere misdiagnosis of a condition or medical need, or negligent treatment provided for a condition, is not actionable as an Eighth Amendment claim because medical malpractice is not a constitutional violation. *Estelle*, 429 U.S. at 106. "Indeed, prison authorities are accorded considerable latitude in the diagnosis and treatment of prisoners." *Durmer*, 991 F.2d at 67 (citations omitted). Furthermore, in a prison medical context, deliberate indifference is generally not found when some significant level of medical care has been offered to the inmate. *Clark v. Doe*, 2000 U.S. Dist. LEXIS 14999, 2000 WL 1522855, at *2 (E.D.Pa. Oct.13, 2000) ("courts have consistently rejected Eighth Amendment claims where an inmate has received some level of medical care"). Thus, such complaints fail as constitutional claims under § 1983 since "the exercise by a doctor of his professional judgment is never deliberate indifference.

*See, e.g., Brown v. Borough of Chambersburg*, 903 F.2d 274, 278 (3d Cir.1990) ('[A]s long as a physician exercises professional judgment his behavior will not violate a prisoner's constitutional rights.')". *Gindraw v. Dendler*, 967 F.Supp. 833, 836 (E.D.Pa. 1997). Applying this exacting standard, courts have frequently rejected Eighth Amendment claims that are based upon the level of professional care that an inmate received; *see, e.g., Ham v. Greer*, 269 F. App'x 149 (3d Cir. 2008); *James v. Dep't of Corrections*, 230 F. App'x 195 (3d. Cir. 2007); *Gillespie v. Hogan*, 182 F. App'x 103 (3d Cir. 2006); *Bronson v. White*, No. 05–2150, 2007 WL 3033865 (M.D.Pa. Oct.15, 2007); *Gindraw v. Dendler*, 967 F.Supp. 833 (E.D.Pa.1997), particularly where it can be shown that significant medical services were provided to the inmate but the prisoner is dissatisfied with the outcome of these services. Instead, courts have defined the precise burden which an inmate must sustain in order to advance an Eighth Amendment claim against a healthcare professional premised on allegedly inadequate care, stating that:

> The district court [may] properly dis[miss an] Eighth Amendment claim, as it concerned [a care giver], because [the] allegations merely amounted to a disagreement over the proper course of his treatment and thus failed to allege a reckless disregard with respect to his ... care. The standard for cruel and unusual punishment under the Eighth Amendment, established by the Supreme Court in [*Estelle*], and its progeny, has two prongs: 1) deliberate indifference by prison officials and 2) serious medical needs. "It is well-settled that claims of negligence or medical malpractice, without some more culpable state of mind, do not constitute 'deliberate indifference.' " "Nor does mere disagreement as to the proper medical treatment support a claim of an eighth amendment violation." .... [The inmate] alleged no

undue delay in receiving treatment and, as the district court noted, the evidence he presented established that he received timely care.... Although [an inmate plaintiff] may have preferred a different course of treatment, [t]his preference alone cannot establish deliberate indifference as such second-guessing is not the province of the courts.

*James*, 230 F.App'x at 197–198. (citations omitted).

In short, any attempt to second-guess the propriety or adequacy of a particular course of treatment is disavowed by courts since such determinations remain a question of sound professional judgment. *Inmates of Allegheny County Jail v. Pierce*, 612 F.2d 754, 762 (3d Cir. 1979) (quoting *Bowring v. Godwin*, 551 F.2d 44, 48 (4th Cir. 1977)).

Here, Caesar's Eighth Amendment medical claim is nothing more than an attempt to second-guess Shiptoski's particular course of treatment. As explained by the Third Circuit, such a claim is disavowed. *Pierce*, 612 F.2d at 762. Further, a claim of overmedication, without more, constitutes "mere negligence," which is also not cognizable under the Eighth Amendment. *See Acosta v. United States Marshal's Serv.*, 445 F.3d 509, 514-15 (1st Cir. 2006). Of course, Caesar alleges that because she was overmedicated, her smock would fall off causing her to trip over her bed and cut her leg. But, the material facts, deemed admitted by Caesar's failure to respond, reveal no evidence that Caesar was harmed or injured during her detention in a POC. Instead, the material facts show that Shiptoski, who maintained authority to admit patients to a POC and diagnose patients detained

there, followed a course of prescribed treatment that was consistent with the course of treatment imposed by the doctors and psychologists who met with Caesar.

Additionally, Caesar also claims that Shiptoski acted with "deliberate indifference" in that he admitted her to a POC without hygiene or legal materials. In this context, the relevant Eighth Amendment inquiry is whether the alleged deprivation was "sufficiently serious" and whether the inmate has been deprived of the "minimal civilized measure of life's necessities." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981)). This requires an inmate to show that "[s]he is incarcerated under conditions posing a substantial risk of serious harm," and that prison officials demonstrated a "deliberate indifference" to her health or safety. *Id.*

Here, the material facts show that Caesar was admitted to a POC under suicide precautions, and her possessions were in fact limited to a suicide blanket, anti-suicide smock, and a mattress. Caesar, though, has not provided any evidence that she suffered harm as a result of being denied hygiene or legal materials. In a similar vein, Caesar's Eighth Amendment claims that Shiptoski acted with "deliberate indifference," in that he admitted her to a POC with a defective smock resulting in her cutting her leg, is without merit. For Caesar to show deliberate indifference, Shiptoski must actually have known or been aware of the excessive risk to her safety. *Beers–Capitol*, 256 F.3d at 125 (3d Cir. 2001). In this instance,

while Shiptoski admits that Caesar was limited to certain supplies while she was detained in a POC, he was never aware that her smock was defective, that she had problems closing it, nor does he recall seeing see her naked. Finally, there is no evidence at all showing that Shiptoski admitted Caesar for any other purpose than to prevent harm to herself and others.

Thus, we cannot say that Shiptoski acted with deliberate indifference under any circumstance, and he is entitled to summary judgment.

## VI. Recommendations.

Based on the above-stated reasons, it is recommended that the defendant's motion for summary judgment (*Doc.* 98) be **GRANTED**.

The Parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a magistrate judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the magistrate judge and all parties, written objections which shall specifically identify the portions of the proposed findings, recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply. A judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own

determination on the basis of that record.  The judge may also receive further evidence, recall witnesses or recommit the matter to the magistrate judge with instructions.

Submitted this **27th** day of **June, 2013**.

**/s/ Susan E. Schwab**
Susan E. Schwab
United States Magistrate Judge